# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 47253-8-II |
| Respondent, | |
| v. | |
| AARON MAURICE MYLAN, | UNPUBLISHED OPINION |
| Appellant. | |

WORSWICK, P.J. — Aaron Mylan appeals his conviction for one count of first degree

unlawful possession of a firearm, arguing that he was denied his right to effective assistance of

counsel because his trial counsel failed to request a necessity defense instruction. We agree and

reverse Mylan's conviction for first degree unlawful possession of a firearm, and remand for a

new trial on that charge.[1]

## FACTS

### A.     *The Altercation on "A" Road*

Mylan was in Forks to spend the day with his friend Rachelle Cabe, who was an admitted

heroin user. When Cabe became sick from withdrawal, Mylan agreed to meet with her heroin

---

[1] Mylan also filed a pro se statement of additional grounds contending that the unlawful
possession of a firearm statute, RCW 9.41.040, as applied to his circumstances, offends the
United States Constitution and Mylan's right to life. Because we reverse and remand on grounds
of ineffective assistance of counsel, we do not undertake a constitutional analysis of RCW
9.41.040 as applied to Mylan.

dealer, Diamond Mueller, on her behalf. Both men agree that Mylan and Mueller met at a gas station in Forks; however, the remainder of their accounts differ drastically.

According to Mylan, he identified himself as Cabe's friend and told Mueller that he wanted to talk. Mueller said that he had to go somewhere, and told Mylan to get in Mueller's truck. Mylan, who had never met Mueller before, complied. The two men drove a short distance along "A" Road, a stretch of road where locals meet with friends, shoot guns, or do drugs.

Mylan requested that Mueller stop selling drugs to Cabe, because he was concerned for her well-being, at which point Mueller stopped the car, pulled out a gun, put it to Mylan's head, and began yelling at him. Mylan then attempted to grab the gun, and a struggle ensued. While the two men battled for possession of the gun, it discharged, missing both men. Mylan managed to eject the magazine, which Mueller began using as a weapon with which to hit him. Mylan was able to take control of the gun and strike Mueller in the head three or four times with the side of the gun, after which a bloodied Mueller rolled backward out of the open driver's side door and onto the ground.

Mylan then decided to leave the scene in Mueller's truck because he feared for his life. He attempted to turn the truck around on the roadway, but got it stuck in a ditch. As he was trying to flee he felt the gun, which had fallen to the ground, bump against his foot. Mylan got out of the truck, taking the gun with him because he feared Mueller would regain possession of it and shoot him. Mylan saw Mueller at the driver's side window of a passing motorist who had stopped. Mylan attempted to get the motorist's attention, then walked ten feet and threw the gun

2

into the woods to prevent Mueller from getting it. Mylan hid in the bushes and called Cabe, who picked him up shortly thereafter.

Mueller's version of events differs drastically from Mylan's. Mueller testified that Mylan did not disclose who he was or that he was Cabe's friend. Instead, Mylan asked Mueller for a ride up "A" Road to meet some friends, which Mueller agreed to. After turning off "A" Road, Mueller claims Mylan pulled out a gun, put it to Mueller's head, and demanded that he pull the truck over because Mylan was going to take it. After Mylan demanded all of Mueller's property, Mueller grabbed for the gun and a struggle ensued, causing the gun to discharge. Mylan then hit Mueller two or three times in the head and face with the butt of the gun, causing Mueller to lose consciousness and forget the remainder of the altercation.

The passing motorist, David Steinbaugh, recalled that a bloodied and frantic Mueller staggered to Steinbaugh's car and pleaded for help. According to Steinbaugh, Mueller told him that a guy asked for a ride up "A" Road, then just started "jacking" him. Verbatim Report of Proceedings (VRP) (Jan. 26, 2015) at 48. Steinbaugh testified that Mueller's truck did a "K turn," then stopped about two feet from his truck. VRP (Jan. 26, 2015) at 49. A man resembling Mylan got out and walked past his vehicle with what looked like a pistol in his hand, but the man did not say anything before disappearing. Steinbaugh declined Mueller's request to let him into his truck, drove away, and called 911.

No. 47253-8-II

B.      *Jury Trial and Verdict*

The State charged Mylan with one count of first degree robbery,[2] two counts of second

degree assault,[3] one count of first degree unlawful possession of a firearm,[4] and one count of

theft of a motor vehicle.[5]  Clerks Papers (CP) at 88-91.

At the jury trial, witnesses testified to the facts given above.  The trial court instructed the

jury on first degree unlawful possession of a firearm:

> To convict the defendant . . . each of the following elements of the crime must be
> proved beyond a reasonable doubt:
>
> (1) That on or about the 24th day of August, 2014, the defendant knowingly had a
> firearm in his possession or control;
>
> (2) That the defendant had previously been convicted of Residential Burglary, a
> serious offense; and
>
> (3) That the possession or control of the firearm occurred in the State of
> Washington.

CP at 72.  Defense counsel submitted self-defense instructions, which applied only to the two

assault charges.  Defense counsel did not propose a necessity defense instruction for the unlawful

possession of a firearm charge, and during closing argument, defense counsel appeared to

concede that the State had proved the charge:

> [DEFENSE COUNSEL]:  I've got to tell you an unlawful possession of a firearms
> [sic] problem.  He did momentarily and fleetingly possess a firearm.  It is not that

---

[2] RCW 9A.56.200(1)(a).

[3] RCW 9A.36.021(1)(a), (c).

[4] RCW 9.41.040(1)(a).

[5] RCW 9A.56.065.

4

hard to understand why somebody would get rid of a firearm under these circumstances, but he did momentarily possess a firearm. It sounds like he possessed it as short as possible a time and then he got rid of it and only then because he was fleeing so I'm not going to give you a lot of fire and brimstone on that one. I would say it was a fleeting and momentary possession.
[STATE]: Your Honor, that's not one of the [i]nstructions we have.
[DEFENSE COUNSEL]: It doesn't have to be an instruction. I can argue the facts.
[THE COURT]: Don't argue it as a law.
[DEFENSE COUNSEL]: I'm not arguing it as a law. I'm saying if the law is it was fleeting and momentary, there's no instruction on that. I'm not arguing instruction, I'm saying it was short.
[THE COURT]: I'll make the rulings, okay? Go ahead.

VRP (Jan. 29, 2015) at 179. At that point, defense counsel moved on. This was the only time during closing argument defense counsel addressed the unlawful possession of a firearm charge.

After less than a day of deliberation, the jury acquitted Mylan of all charges except first degree unlawful possession of a firearm. Mylan appeals.

ANALYSIS

INEFFECTIVE ASSISTANCE OF COUNSEL

Mylan argues that defense counsel's failure to request a necessity defense instruction deprived him of the effective assistance of counsel. The State argues that Mylan was not entitled to a necessity instruction, and that counsel had a legitimate trial strategy for not requesting one. We agree with Mylan.

A.    *Legal Principles*

Effective assistance of counsel is guaranteed by both U.S. Const. amend. VI and Wash. Const. art. I, § 22. *State v. Hendrickson*, 129 Wn.2d 61, 77, 917 P.2d 563 (1996). Washington has adopted the *Strickland* test to determine whether a criminal defendant received constitutionally sufficient representation. *State v. Thomas*, 109 Wn.2d 222, 225, 743 P.2d 816

5

(1987) (*citing Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). Under the *Strickland* test, the defendant must show that counsel's performance was deficient and that the deficient performance was prejudicial. *State v. Cienfuegos*, 144 Wn.2d 222, 226-27, 25 P.3d 1011 (2001).

We measure counsel's performance by an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. To prevail on an ineffective assistance claim, a defendant must overcome "a strong presumption that counsel's performance was reasonable." *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). Legitimate trial strategy or tactics do not constitute deficient performance. *Hendrickson*, 129 Wn.2d at 77-78.

To satisfy *Strickland*'s prejudice prong, the defendant bears the burden of establishing that "there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different." *Kyllo*, 166 Wn.2d at 862; *Cienfuegos*, 144 Wn.2d at 227. Where the ineffective assistance of counsel is alleged to be caused by the failure of trial counsel to request a jury instruction, the court must also find that the defendant was entitled to the instruction. *State v. Johnston*, 143 Wn. App. 1, 21, 177 P.3d 1127 (2007). The remedy for a trial conducted with the ineffective assistance of counsel is for the cause to be remanded for a new trial. *State v. Ermert*, 94 Wn.2d 839, 851, 621 P.2d 121 (1980).

B.      *Counsel's Performance Was Deficient*

Mylan argues he was denied his due process right to effective assistance of counsel because his trial counsel failed to request a necessity instruction as a defense to first degree unlawful possession of a firearm. We agree.

1. *Necessity Defense*

Mylan must first show that he was entitled to a necessity instruction. *Johnston*, 143 Wn. App. at 21. We hold that he was.

Mylan has the burden to show that the facts in evidence support the instruction. *Cienfuegos*, 144 Wn.2d at 227. In conducting this analysis, we interpret the evidence in the light most favorable to the defendant. *State v. Buzzell*, 148 Wn. App. 592, 602, 200 P.3d 287 (2009) (*citing State v. Fernandez-Medina*, 141 Wn.2d 448, 455-56, 6 P.3d 1150 (2000)).

Washington has expressly adopted the federal test set forth in *United States v. Lemon*, 824 F.2d 763 (9th Cir. 1987), to determine whether a defendant is entitled to a necessity defense. *State v. Jeffrey*, 77 Wn. App. 222, 226, 889 P.2d 956 (1995). Under *Lemon*, a defendant who asserts a necessity defense must establish by a preponderance of the evidence that (1) he was under unlawful and present threat of death or serious bodily injury, (2) he did not recklessly place himself in a situation where he would be forced to engage in criminal conduct, (3) he had no reasonable legal alternative, and (4) there was a direct causal relationship between the criminal action and the avoidance of the threatened harm. *Jeffrey*, 77 Wn. App. at 224 (citing *Lemon*, 824 F.2d at 763).

Mueller and Mylan gave wildly varying accounts of how the altercation on "A" Road began; nonetheless, we view the facts in the light most favorable to Mylan. Thus, we consider whether Mylan's account of the events establishes the four elements articulated in *Lemon*.

a. *Present Threat of Death or Serious Bodily Injury*

Mylan testified that after he asked Mueller to stop selling drugs to Cabe, Mueller pulled out a gun and held it to Mylan's head. Mueller was irate and yelling at him. A violent and bloody struggle then took place inside Mueller's truck during which a gun discharged. After Mueller fell out of the truck, Mylan feared for his life and attempted to drive away from the scene. After getting the truck stuck in a ditch, Mylan believed the only way to secure his safety was to take the gun from inside the vehicle and throw it in the woods where Mueller, who may still have been in possession of the gun's magazine, could not retrieve it. Viewing the evidence in the light most favorable to Mylan, we conclude that sufficient evidence existed that Mylan was under an unlawful and present threat of death or serious bodily injury.

b. *Lack of Recklessness*

Mylan approached Mueller at the gas station for the express purpose of asking Mueller to stop selling drugs to Cabe. After Mylan told Mueller he wanted to speak with him, Mueller told Mylan he needed to go somewhere and asked Mylan to get into his truck. Mylan testified that he did not have any concern for his safety at that point because he had "extensive experience . . . with heroin" and had been around drug dealers before, that Forks was a small town, and that Mueller said he would bring him back afterward. VRP (Jan. 29, 2015) at 34. Viewing the facts in the light most favorable to Mylan, the evidence shows that Mylan did not recklessly place himself in a situation where he would be forced to engage in criminal conduct.

c. *No Reasonable Legal Alternative*

In order to show that a defendant had no reasonable legal alternative, he must show that "'he had actually tried the alternative or had no time to try it, or that a history of futile attempts revealed the illusionary benefits of the alternative.'" *State v Parker*, 127 Wn. App. 352, 355, 110 P.3d 1152 (2005) (internal quotation marks omitted) (quoting *United States v. Harper*, 802 F.2d 115, 118 (5th Cir.1986)). Mylan testified that the point at which he first reached for the gun, Mueller had already pointed it at his head and threatened his life, and was still pointing the gun at his midsection. When Mueller looked away, Mylan grabbed the gun and the struggle ensued. Mylan feared that Mueller would shoot him if Mueller got the gun back. As Mylan was trying to flee, he regained possession of the gun, exited the vehicle, walked ten feet past Steinbaugh's truck, and threw the gun in the woods.

Prior to reaching for the gun, Mylan's legal alternatives were largely limited to jumping from a moving vehicle or calling 911 while a gun was pointed directly at him. The State asserts that after getting the truck stuck in the ditch, it would have been reasonable for Mylan to call the police, leave the gun in the locked truck and take the keys, or immediately throw the gun into the woods, rather than walk ten feet past Steinbaugh's truck to do so.

Mylan's account of the incident on "A" Road, and his testimony that he was reacting to a suddenly violent situation in a fearful, disoriented and panicked state, supports the conclusion that he had no time to try the State's suggested course of action. Therefore, he did not have any reasonable legal alternative to momentarily possessing the gun in order to defend himself inside the truck, then secure his own safety by disposing of the gun in the woods.

d. *Direct Causal Relationship*

Mylan testified Mueller verbally and physically threatened him with the gun. He also testified that he reached for the gun so that he would not get shot, and that he retained possession of the gun and threw it into the woods so that Mueller would not get it back and shoot him. These actions bore a direct causal relationship between his possessing the gun and his attempt to avoid the threatened harm by Mueller.

e. *Mylan Entitled to Instruction*

The evidence, taken in the light most favorable to Mylan, supports each element of the *Lemon* test by a preponderance of the evidence. Mylan was under an unlawful present threat of death or serious bodily injury, he did not recklessly place himself in that situation, he had no reasonable legal alternative to his actions, and threat of harm from Mueller was the direct cause for his momentary possession and disposal of the gun. Therefore, we hold that Mylan was entitled to a necessity instruction based on the evidence.

2. *Trial Strategy*

"Deficient performance is not shown by matters that go to trial strategy or tactics." *Hendrickson*, 129 Wn.2d at 77-78. Therefore, defense counsel's failure to request a necessity instruction is not deficient performance if the decision to do so was a matter of trial strategy. The State argues that defense counsel's choice to argue self-defense rather than necessity was a legitimate trial strategy. We disagree.

The State argues that arguing self-defense was a strategic choice to seek acquittal of the assault and robbery charges at the expense of risking the lesser conviction of unlawful possession

of a firearm. But, Mylan's counsel was not required to choose between arguing self-defense and the defense of necessity. The State does not point to any legal conflict between these defenses, nor are we aware of any. Therefore, we conclude that defense counsel was not prohibited from requesting a necessity defense instruction to defend Mylan against the unlawful possession of a firearm charge by virtue of seeking a theory of self-defense for the assault charges.

Once the State's argument falls away, no trial strategy explains defense counsel's failure to request a necessity instruction on the unlawful possession of a firearm charge. Mylan's trial counsel failed to defend that charge at all.

Defense counsel's theory of self-defense on the assault charges did nothing to defend Mylan against the charge of unlawful possession of a firearm. There is nothing that prohibited defense counsel from bringing a necessity instruction while seeking a theory of self-defense on other charges. We hold that defense counsel's failure to request a necessity instruction was not a legitimate trial strategy.

C.      *Counsel's Deficient Performance Prejudiced Mylan*

Under the second prong of the *Strickland* test, Mylan must show that counsel's deficient performance prejudiced Mylan's defense. *Cienfuegos*, 144 Wn.2d at 227. To establish prejudice, Mylan must show that there is a reasonable probability that the result of the proceeding would have been different if counsel had not rendered deficient performance. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995) (citing *Thomas*, 109 Wn.2d at 225-26). We hold that Mylan was prejudiced by counsel's deficient performance.

To convict Mylan of first degree unlawful possession of a firearm, the jury instructions required the jury to find (1) Mylan knowingly possessed a firearm on August 24, 2014, (2) he had previously been convicted of residential burglary, and (3) he possessed the firearm while in Washington. CP at 72. Mylan's own testimony clearly established each of these elements. Mylan's only hope of acquittal on this charge would be an affirmative defense.

However, nothing in the jury instructions allowed the jury to weigh the mitigating circumstance that Mylan's possession of a firearm may have been necessary in order to defend himself against the unlawful threat of death or serious injury. The jury was, therefore, left to enter deliberations with a clear instruction, an admission from the defendant that met all of the instruction's elements, and no convincing attempt from counsel to dissuade the jury from a conviction. Without the necessity defense to which he was entitled, the jury would have had to abandon its duty and ignore the evidence in order to find Mylan not guilty.

Perhaps most importantly, after weighing the wildly varying accounts of the altercation, the jury weighed the credibility of the parties and ultimately acquitted Mylan of the four charges where Mylan asserted an affirmative defense. Had the jury had the opportunity to decide on a necessity defense, it would have weighed the same evidence it used to acquit Mylan of the other four charges.

Based on the evidence in the record, there is a reasonable probability that the result of Mylan's conviction would have been different if defense counsel had not rendered deficient performance by failing to request a jury instruction of necessity. The evidence supports that

No. 47253-8-II

Mylan was denied his due process right to effective counsel because he received deficient representation that prejudiced the outcome of the trial.

CONCLUSION

We hold that defense counsel's failure to request a necessity instruction to defend against the charge of first degree unlawful possession of a firearm deprived Mylan of the effective assistance of counsel. Accordingly, we reverse and remand for a new trial on that charge.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Worswick, P.J.

We concur:

Lee, J.

Melnick, J.